**Doris LACY, Employee–Appellant,**

v.

**FEDERAL MOGUL, Employer–Respondent,**

**St. Paul Travelers Company, Insurer–Respondent,**

and

**Missouri State Treasurer, Custodian of the Second Injury Fund, Respondent.**

**No. SD 28726.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 2, 2009.

Motion for Rehearing and Transfer Denied Feb. 24, 2009.

Application for Transfer Denied March 31, 2009.

Joseph P. Rice, III, Cape Girardeau, MO, for Appellant.

Mary Anne Lindsey, St. Louis, MO, for Respondents Federal Mogul and St. Paul Travelers Co.

Jeremiah W. (Jay) Nixon, Atty. Gen. Deborah A. Ledgerwood, Asst. Atty. Gen. of Cape Girardeau, MO, for Respondent Second Injury Fund.

JEFFREY W. BATES, Judge.

Doris Lacy (Claimant) appeals from a final award entered by the Labor and Industrial Relations Commission (the Commission) denying compensation on claims she filed against her employer, Federal Mogul (Employer); Employer's insurer, St. Paul Travelers; and the Missouri State Treasurer in his capacity as Custodian of the Second Injury Fund (the Fund). *See* § 287.220.[1] Claimant contended that she was injured when she fell at work and that this work-related injury, combined with other injuries she previously sustained in a car accident, rendered her totally and permanently disabled.[2] The Commission denied both claims because Claimant failed to meet her burden of proving that: (1) her fall at work resulted in any compensable injury; and (2) the injuries for which she received treatment were causally related to the fall. On appeal, Claimant challenges the Commission's reliance on a doctor's opinion about the cause of Claimant's injuries and the Commission's finding that Claimant failed to meet her burden of proof as to causation. Finding no error, this Court affirms.

## I. Factual and Procedural Background

Claimant began working for Employer in October 1987 operating a groover machine, which was used in the manufacture of pistons. Claimant's job involved bending and lifting pistons out of baskets.

Since the 1970's, Claimant's general medical care had been provided by Dr. James Campbell. Prior to March 1999, Dr. Campbell treated Claimant for migraine headaches. Dr. Campbell described these as "recurrent headaches of a severe nature" and treated them with narcotic and analgesic medications. During this time frame, Dr. Campbell also treated Claimant for anxiety and depression.

In March 1999, Claimant's C–2 vertebra was fractured in a car accident. Her initial treatment was provided by Dr. David Yingling. At first, Claimant's fracture was stabilized with a halo apparatus. After three months, the halo was replaced with a soft neck collar.

As Claimant's fracture healed, she developed neck pain and was prescribed medication for that condition by Dr. Campbell. Throughout Claimant's recovery, she also continued to be treated by Dr. Campbell for migraine headaches, anxiety and depression. Following the March 1999 accident, Dr. Campbell prescribed a number of different narcotic and analgesic medications, anti-anxiety and anti-depressant medications, migraine treatments and sleep aids for Claimant.

Eventually, Dr. Yingling referred Claimant to Dr. Mohammad Shakil for treatment of her neck pain. In January 2000, Dr. Shakil performed a cervical facet rhizotomy. Not long after this procedure, Claimant was able to return to work. She had been off work for ten months because of the injuries she sustained in the car accident.

When Claimant returned to work in January 2000, she was released from Dr. Yingling's care without restrictions. Claimant was able to perform the same job she had been doing before the car accident. Between January 2000 and May 2001, Claimant continued to see Dr. Campbell on a

1. All references to statutes are to RSMo (2000).

2. The Fund "compensates injured employees when a current work-related injury combines with a prior disability to create an increased combined disability." *Stonecipher v. Poplar Bluff R1 School Dist.*, 205 S.W.3d 326, 327 (Mo.App.2006).

regular basis. During this time period, Claimant continued to complain of neck pain, which was exacerbated when Claimant was under stress (e.g., when close family members were ill). Dr. Campbell prescribed Flexeril, Restoril, Paxil and Lortab as needed to treat Claimant's neck pain.

On or about May 17, 2001, Claimant's foot slipped out from under her as she was walking through oil and water substances on the plant floor. She landed on her buttocks and felt a sharp pain in her low back and neck. According to Claimant, she initially was concerned that she may have "re-broke" her neck. Co-worker Allen Blume saw Claimant fall and helped her up off the floor. Claimant's supervisor, Tony Campbell, walked over and asked Claimant if she needed to see a first responder or go to the doctor. After taking a moment to recover, Claimant said that she thought she would be okay. Although she hurt, it was just an initial hurt from falling down. She returned to her machine and finished her shift.

Sometime later, Claimant filed an Accident/Incident Investigation Report (the accident report). In that document, Claimant reported the accident had occurred on May 27, 2001. Initially, Claimant had listed the date of the accident as May 15, 2001. That date was crossed out, and the 27th was written instead. She identified the part of the body that was injured as "neck, lower back." When responding to another question asking whether the accident resulted in an injury, however, Claimant wrote "no." Her answer stated that

no first aid was given and that she did not seek any treatment. After the accident, Claimant returned to work as scheduled. During the weeks ending on May 20, May 27 and June 3, she worked 42 hours, 57.5 hours and 53.5 hours, respectively.

On June 4, 2001, Claimant saw Dr. Campbell for the first time since she fell. At that time, Claimant was suffering from an acute migraine headache and had to be examined in the back seat of her car. According to Dr. Campbell's notes from that visit, Claimant only sought treatment for her headache.[3] On June 12, 2001, Dr. Campbell refilled Claimant's prescriptions for the very same medications she had been taking before she fell at work.

On June 6, 2001, Claimant went on medical leave, but she continued to work intermittently through mid-June.[4] On June 13, 2001, Claimant called Dr. Campbell and complained of headaches and neck aches. The doctor prescribed further treatment and medications for headaches, offered to refer Claimant back to Dr. Yingling and scheduled a magnetic resonance imaging (MRI) scan.

On June 18, 2001, Claimant filled out a short-term disability accident and sickness form. This form showed the date of disability as June 12, 2001, and identified the type of disability as the March 1999 car accident. On June 20, 2001, Dr. Campbell signed a physician's statement stating that Claimant should not return to work until after she saw Dr. Yingling on June 28, 2001.

---

3. At the hearing before the administrative law judge, Claimant testified that she reported her fall at work to Dr. Campbell on this occasion. Likewise, the doctor testified that he remembered Claimant telling him about the accident around that time. Nevertheless, Dr. Campbell acknowledged that he prided himself on recording good historical information from his patients, and he could not explain why his

notes contained no reference to Claimant having fallen at work.

4. According to Claimant's payroll records, she worked 19 hours during the week ending June 10. She worked 17 hours during the week ending June 17. Thereafter, Claimant did not return to work for Employer.

Claimant saw Dr. Yingling as scheduled. During this office visit, Claimant reported that she had been having persistent problems with pain in the posterior right neck since she slipped and fell "two weeks ago." This was the first time that Claimant's medical records contain any reference to that fall. A cervical spine MRI showed evidence of a hemangioma in the vertebral body of C3 and a bulging disc at C4–C5, but there was no evidence of any compressive lesions. Cervical spine x-rays demonstrated moderate degenerative changes with no evidence of instability. Claimant continued to have problems with migraine headaches. Dr. Yingling recommended a course of physical therapy and referred Claimant to a neurologist.

On July 3, 2001, Claimant was seen by Dr. Kit Mays at his pain and rehabilitation clinic. Claimant's chief complaints were neck, shoulder and arm pain. Claimant related that she had suffered a cervical fracture in 1999 and had done reasonably well until mid-June 2001, when she slipped and fell at work. Claimant said that she had been seen by Dr. Campbell the next day. On physical exam, Claimant's range of motion in her cervical spine was limited in all planes. Dr. Mays determined that Claimant was taking a very large amount of narcotic medications, which was not in her best interest. In Dr. Mays' opinion, Claimant likely had fibromyalgia that was unrelated to her neck problem. Dr. Mays found no surgically correctable problem in Claimant's neck. The doctor's plan was to wean Claimant off of narcotics and get her on more appropriate medications.

On July 16, 2001, Dr. Campbell saw Claimant again. She complained of head and neck pain. According to Dr. Campbell's notes, it was during this visit that Claimant first mentioned that she had slipped and fallen at work. Dr. Campbell continued to treat Claimant's neck pain and migraine headaches with the same course of medications that had been previously prescribed.

On July 16, 2001, Claimant also filled out another short-term disability claim form. This time, she reported the date of disability as May 17, 2001. The cause of her disability was listed as a work-related injury that occurred on May 17. The chief complaint was back pain, and the diagnosis was back pain, lumbar spine and disc trauma. According to Dr. Campbell's records, however, the first time that Claimant reported any pain in her back was on July 19, 2001.

On August 12, 2001, Claimant went to the emergency room complaining of low back pain. During this visit, Claimant attributed her low back problems to the fall that occurred at work. Claimant stated that housework she had been doing before coming to the hospital had caused her back pain to increase. An MRI performed three days later showed slight bulging discs at L3–L4 and L4–L5 and mild degeneration of the facet joints. There was no evidence of a herniated disc, spinal stenosis or neuroforamninal narrowing. Dr. Campbell continued to treat Claimant for pain and referred her to physiatrist Dr. Bernard Burns.

Claimant saw Dr. Burns in October 2001. Claimant complained of neck and low back pain. She stated that: (1) her symptoms dated back to the 1999 car accident in which she suffered a C–2 fracture; (2) she had returned to work with occasional neck pain and migraines; and (3) she had fallen in May 2001. Thereafter, her neck and intrascapular pain increased, and she began to have low back pain with radiation down her right leg. Dr. Burns diagnosed Claimant as having myofascial pain secondary to the May 2001 fall, but he stated that Claimant's mechanical low back pain was only "questionably" related to the

fall. Dr. Burns performed trigger point injections and directed Claimant to continue with her medications from Dr. Campbell.

Claimant filed a worker's compensation claim in October 2001. An amended claim was filed in April 2002. In the amended claim, Claimant alleged that she sustained injury to her neck and low back between May 10–17, 2001 at work, resulting in a permanent and total disability. Claimant alleged that the injury occurred as she was walking across the floor when her foot slipped out from under her, causing her to fall and land on her buttocks. In Employer's answer, it denied these allegations.

Hearings were held before an administrative law judge (ALJ) in October 2005 and August 2006. The parties stipulated, *inter alia*, that Employer had not paid any medical expenses or temporary total disability benefits. The issues for resolution included accident or occupational disease, notice, medical causation, future medical care, the nature and extent of any disability and the Fund's liability.

Claimant's evidence included medical testimony from Dr. David Volarich, a retained expert, and Dr. Campbell, Claimant's treating physician. Employer's evidence included a medical report and related testimony from Dr. John Wagner, a retained expert. The opinions of Dr. Volarich and Dr. Campbell differed significantly from those of Dr. Wagner concerning whether Claimant was injured as a result of the May 2001 fall and, if so, whether that injury caused the medical conditions for which she was seeking compensation.

Dr. Volarich based his opinions on a medical examination of Claimant and a review of her medical records. Dr. Volarich opined that the May 2001 fall jarred her neck and back. This jarring was a substantial contributing factor in causing: (1) a cervical syndrome that included a C4–C5 disc protrusion and aggravation of Claimant's degenerative disc and joint disease; (2) aggravation of her migraine headaches; (3) a lumbar syndrome that included a bulging L4–L5 disc with intermittent right leg sciatica; and (4) myofascial pain syndrome. Dr. Volarich conceded that there were some inconsistencies in Claimant's medical records. For example, Dr. Volarich acknowledged that, according to Dr. Campbell's records, Claimant did not immediately report either a work accident or any back injury to that doctor. Such omissions would raise a possible question in Dr. Volarich's mind as to whether there was a causal relationship between Claimant's later complaints and the fall at work. Dr. Volarich also admitted that the medications Dr. Campbell prescribed to Claimant in June 2001 were the same strength and frequency as those he previously prescribed.

Claimant's other medical expert was Dr. Campbell. He opined that Claimant was injured during the May 2001 fall at work. According to Dr. Campbell, this fall exacerbated Claimant's pre-existing neck injury and also caused her low back problems, which rendered her nearly unable to function. As support for that opinion, Dr. Campbell testified that his records would show Claimant required stronger and more frequent medication after she fell.

Like Dr. Volarich, Dr. Wagner also based his opinions upon a review of Claimant's medical records and a medical examination of her. The medical records revealed that she had no acute symptoms at the time of the fall, there was a significant delay before she mentioned that event to Dr. Campbell, and Claimant's complaints remained the same before and after she fell. Dr. Wagner opined that, at most, Claimant may have sustained an "extremely mild" sprain injury to her neck and back

as a result of falling at work. Her fall did not cause or accelerate the degenerative changes to her cervical or lumbar spine. In Dr. Wagner's opinion, the various conditions described by other physicians were not related to Claimant's fall. Instead, these conditions were related to her prior cervical fracture and her pre-existing degenerative disease of the cervical and lumbar spine. Dr. Wagner described Claimant's symptoms and their development as "classical degenerative disease in the neck and back." According to Dr. Wagner, Claimant's condition also was complicated by pre-existing depression and anxiety, which often aggravate chronic pain, and her use of multiple drugs.

In November 2006, the ALJ issued a decision denying compensation. First, the ALJ decided that Claimant failed to meet her burden of proving that she sustained any injury when she fell. The conclusion was supported by the accident report indicating that she did not receive first aid or seek treatment and by the overtime work that Claimant performed during the two weeks after the fall. Second, the ALJ decided that Claimant failed to prove that the treatment she had received was causally related to the fall. The ALJ relied upon the following facts to support that conclusion:

1. The initial disability form indicated that Claimant's disability resulted from the March 1999 car accident.

2. Although Claimant said she was concerned that she "re-broke" her neck when she fell, she did not see Dr. Campbell until June 4.

3. During that visit, Claimant sought treatment for a migraine headache. She did not mention that she had fallen at work.

4. Claimant did not mention the fall to Dr. Campbell until July 16, which was nearly two months after that event occurred.

5. Claimant did not report back pain to Dr. Campbell until July 19. She did not attribute that pain to the fall until the emergency room visit on August 12, which was nearly three months after her claimed injury.

6. The fall occurred in mid-May. Claimant incorrectly reported the date as late May in the accident report, and she incorrectly reported the date as mid-June in the medical histories that she gave to Dr. Yingling and Dr. Mays.

7. For several years prior and up to mid-May 2001, Claimant had been undergoing frequent treatment for neck pain and migraine headaches.

8. Contrary to Dr. Campbell's testimony, his own records revealed that the medication he prescribed to Claimant in the four and one-half months before the fall was very similar in type and amount to the medication Dr. Campbell prescribed after the fall.

9. Claimant was not credible because her testimony was inconsistent with other evidence in the record.

10. The medical opinions of Drs. Volarich, Campbell and Burns were not found to be credible.

11. The medical opinion of Dr. Wagner was found to be credible. His testimony supported the conclusion that Claimant's fall did not have a significant impact on her headaches, neck and low back problems. The fall also did not cause or accelerate Claimant's pre-existing degenerative changes in her cervical or lumbar spine.

12. There was insufficient evidence to support a finding that Claimant's fall was a substantial factor in ag-

gravating her pre-existing injuries or causing any new injuries.

Therefore, the ALJ denied compensation on the claims against Employer and the Fund.

In December 2006, Claimant filed her application for review with the Commission. In September 2007, the Commission adopted the ALJ's award denying compensation by a two-to-one vote. This appeal followed.

## II. Standard of Review

 Because the Commission adopted the ALJ's findings and decision, we will review them in this appeal from the Commission's final award denying compensation. *Hawthorne v. Lester E. Cox Medical Centers,* 165 S.W.3d 587, 592 (Mo.App. 2005); *Birdsong v. Waste Management,* 147 S.W.3d 132, 137 (Mo.App.2004). The scope of our review is limited:

> Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; (4) That there was not sufficient, competent evidence in the record to warrant the making of the award.

§ 287.495.1. This Court examines the whole record to determine if it contains sufficient, competent and substantial evidence to support the award. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003).[5] "Only in rare cases will we find an award by the Commission to be contrary to the overwhelming weight of the evidence." *Roberts v. Missouri Highway and Transp. Comm'n,* 222 S.W.3d 322, 331 (Mo.App.2007).

 On appeal, this Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony. *Birdsong,* 147 S.W.3d at 137. In that regard, it is important to note that conflicting medical theories present a credibility determination for the Commission to make. "[D]eciding which one of two conflicting medical theories it should accept is a determination particularly for the Commission. A determination of what weight it will accord expert testimony on matters relating to medical causation lies within the Commission's sole discretion and cannot be reviewed by this Court." *Aldridge v. Southern Missouri Gas Co.,* 131 S.W.3d 876, 882 (Mo.App.2004) (citation omitted). Therefore, the Commission's decision in this case as to which of the various medical experts to believe is binding on this Court. *See, e.g., Messex v. Sachs Elec. Co.,* 989 S.W.2d 206, 211 (Mo.App.1999); *Bruflat v. Mister Guy, Inc.,* 933 S.W.2d 829, 835 (Mo.App.1996); *Sommer v. Sommer & Hartstein,* 888 S.W.2d 398, 400 (Mo.App.1994). "Commission decisions that are interpretations or applications of law, on the other hand, are reviewed for correctness without deference to the Commission's judgment." *Birdsong,* 147 S.W.3d at 138. We independently review questions of law. *Johnson v.*

**5.** We note several cases overruled by *Hampton* are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Hampton,* 121 S.W.3d at 224–32. No further acknowledgment of *Hampton*'s effect on those cases needs to be recited hereafter.

*Denton Construction Co.,* 911 S.W.2d 286, 287 (Mo. banc 1995).

In the case at bar, we also note that Commissioner Ringer cast the deciding vote based on the rule of necessity because the other two commissioners were deadlocked, and no other mechanism exists by which to resolve the claims. *Barker v. Secretary of State's Office,* 752 S.W.2d 437 (Mo.App.1988), suggests that an appellate court must conduct its review with "special intensity" and thoroughly examine the record and circumstances to determine if any injustice has been done. *Id.* at 441. Nevertheless, such heightened scrutiny does not permit this Court to enlarge the standard of review beyond the limits prescribed by the General Assembly. *See Henley v. Fair Grove R–10 School Dist.,* 253 S.W.3d 115, 126–27 (Mo.App.2008). "It is within that scope of review, as set forth *supra,* that we have proceeded in the case at bar, with as thorough a review of the record as we could muster and with as critical an eye as our cognitive abilities allow." *Id.* at 127.

### III. Discussion and Decision

In Claimant's first point, she contends the Commission erred in relying upon Dr. Wagner's opinion to find that Claimant's injuries were not caused by her fall at work. Claimant argues that Dr. Wagner's medical testimony was not competent and substantial evidence because it was based upon improper assumptions.

While Claimant's point purports to challenge the sufficiency of the evidence, the thrust of her argument is that Dr. Wagner's testimony did not meet the requirements necessary for the admission of expert testimony. That was the issue discussed in *McGuire v. Seltsam,* 138 S.W.3d 718, 720–21 (Mo. banc 2004), and *State Bd. of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146, 153 (Mo. banc 2003), which are the principal authorities cited by Claimant. The difficulty with Claimant's argument is that her objection to the admission of Dr. Wagner's medical opinions was not presented below and, therefore, is not preserved for appeal. "Admissibility only becomes an issue if there is a timely and specific objection." *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 860 (Mo. banc 1993). A party is not permitted to "back-door" an issue relating to the admissibility of expert testimony under the guise of a sufficiency of the evidence argument. *Id.* Once Dr. Wagner's expert opinions were admitted without objection, it was up to the Commission to assess the credibility of the doctor's testimony and determine what weight to give that evidence. *See State v. Butler,* 24 S.W.3d 21, 25 (Mo.App.2000). The Commission found Dr. Wagner to be credible and specifically relied upon his testimony to decide the factual issues presented. The Commission committed no error in doing so. *See, e.g., Washington v. Barnes Hosp.,* 897 S.W.2d 611, 615–16 (Mo. banc 1995); *Peters v. General Motors Corp.,* 200 S.W.3d 1, 19–20 (Mo.App.2006); *Lee v. Hiler,* 141 S.W.3d 517, 523–24 (Mo. App.2004); *Lewis v. FAG Bearings Corp.,* 5 S.W.3d 579, 586 (Mo.App.1999). Point I is denied.

In Claimant's second point, she contends the Commission erred in finding the Claimant did not prove that her injuries were caused by the accident because that finding is not supported by sufficient competent and substantial evidence. Claimant argues that the evidence is insufficient because the Commission: (a) improperly held Claimant to a higher standard of proof by adopting the assumptions of Dr. Wagner; (b) made unjustified negative credibility determinations of Claimant and Dr. Campbell; and (c) made an unsupported finding that the accident report did not indicate an injury to her neck and back. Each argument will be addressed in turn.

It was Claimant's burden to prove that an accident occurred and that it resulted in injury to her. *Roberts v. Missouri Highway and Transp. Comm'n*, 222 S.W.3d 322, 331 (Mo.App.2007); *Clark v. FAG Bearings Corp.*, 134 S.W.3d 730, 734 (Mo.App.2004). In May 2001, a work-related accident had to produce "at the time objective symptoms of an injury." § 287.020.2. In addition, an injury was not considered work related unless the work was a substantial factor in the cause of the resulting medical condition or disability. *Id.* In addition, "[f]or an injury to be compensable, the evidence must establish a causal connection between the accident and the injury." *Clark*, 134 S.W.3d at 734; *see Lingerfelt v. Elite Logistics, Inc.*, 255 S.W.3d 1, 6 (Mo.App.2008). Thus, Claimant bore the burden of proving all the essential elements of her claim, including causation. *Roberts*, 222 S.W.3d at 331. "In cases in which more than one event could have caused a condition but only one is compensable, a claimant has the burden of proving the nature and extent of disability attributable to his or her job duties or workplace." *Decker v. Square D Co.*, 974 S.W.2d 667, 670 (Mo.App.1998).

In Claimant's first argument, she contends that the Commission's reliance upon Dr. Wagner's improper opinion testimony erroneously held Claimant to a higher burden of proof than was legally required. Claimant argues that Dr. Wagner's testimony erroneously assumed Claimant was not injured in the fall because she was not immediately debilitated. No objection to Dr. Wagner's testimony on this ground was presented below. Therefore, the admissibility issue is not before us. This argument is simply another attempt to present an unpreserved admissibility argument disguised as a burden-of-proof argument. The first prong of Claimant's argument has no merit.

In Claimant's second argument, she contends the Commission made "unjustified negative credibility determinations" of Claimant and Dr. Campbell by relying on Dr. Wagner's testimony that, if Claimant had told Dr. Campbell about the accident in early June as they both testified before the ALJ, Dr. Campbell would likely have put it in his office notes. During Dr. Wagner's deposition, Claimant's attorney did object to this one exchange as improper expert testimony. That objection appears to have been overruled by the ALJ. On appeal, however, Claimant's second point only challenges the sufficiency of the evidence to support the Commission's findings. Therefore, the admissibility issue is not before us and will not be addressed. Claimant's challenge to the sufficiency of the evidence fails. It is undisputed that none of Dr. Campbell's office notes prior to July 16, 2001, contain any reference to Claimant falling at work. Dr. Campbell said he remembered being told this information before July, but he could not explain why his earlier notes did not contain that information. The unexplained absence of this information from Dr. Campbell's medical records raised a legitimate credibility issue, which the Commission resolved adversely to both Claimant and Dr. Campbell. The Commission, as the finder of fact, "is free to believe or disbelieve any evidence presented." *Bowers v. Hiland Dairy Co.*, 188 S.W.3d 79, 85 (Mo.App.2006). Even if Dr. Wagner's testimony is ignored, there was ample other evidence to support the Commission's determination that Claimant and Dr. Campbell were not credible. Those credibility determinations are binding on this Court. *See Birdsong v. Waste Management*, 147 S.W.3d 132, 137–38 (Mo.App. 2004); *Aldridge v. Southern Missouri Gas Co.*, 131 S.W.3d 876, 882 (Mo.App.2004).

The second prong of Claimant's argument has no merit.

In Claimant's third argument, she contends that the Commission misread the accident report because that document refers to injuries to Claimant's neck and lower back. In that document, however, Claimant answered "no" to the question of whether the accident resulted in an injury. Given these conflicting responses, it was up to the Commission to decide what weight to give this document, when considered along with all of the other evidence presented. *Birdsong,* 147 S.W.3d at 139–40. This Court must defer to the Commission's decision. *Henley v. Tan Co., Inc.,* 140 S.W.3d 195, 198 (Mo.App.2004). Point II is denied.

The Commission's final award denying compensation is affirmed.

PARRISH, P.J., and SCOTT, J., Concur.